# EXHIBIT A

| | |
|---|---|
| State of Illinois | ) |
| | ) ss |
| County of St. Clair | ) |

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY IN SUPPORT OF COMPLAINT FOR FORFEITURE

I, Marijo T. Gronewold, declare under penalty of perjury the following:

At all relevant times, I have been a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations (HSI). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers. Since November 2020, I have been participating in an investigation which is being jointly conducted by the United States Department of Agriculture, Office of Inspector General (USDA-OIG), Homeland Security Investigations (HSI), and the Illinois Department of Revenue, Criminal Investigation Division (IDOR-CID) concerning the trafficking of Supplemental Nutrition Assistance Program (SNAP) benefits at East Side Meat Market.

### I.      Overview of the SNAP Program

1. SNAP, which is formerly known as the food stamp program, is a federal benefit program intended to assist low-income individuals and families with purchasing food. SNAP is managed by the USDA's Food and Nutrition Service (FNS) and administered by state agencies. The Illinois Department of Human Services (IDHS) is responsible for administering the SNAP program in Illinois. Recipients of SNAP benefits in Illinois receive their allotted SNAP benefits electronically on an Electronic Benefits Transfer ("EBT") card, commonly known as a "LINK card."

2. A recipient may use the allotted SNAP benefits on his/her LINK card to purchase eligible food items from authorized retailers. SNAP benefits may not be exchanged for cash. SNAP benefits also may not be used to purchase alcohol, tobacco, hot foods, food sold for on-premises consumption, and non-food products, such as cleaning supplies, toiletries, cosmetics, pet food, medicines and vitamins. *See, e.g.*, 7 C.F.R., Sections 274.7(a), 278.2(a).

3. Not all businesses are authorized to participate in SNAP. For a store to become eligible to accept SNAP benefits, a store operator is required to complete, sign, and submit a SNAP for Stores, otherwise called a Form FNS-252. A Form FNS-252 requires the store operator to provide certain information, including: (1) the store's name and location; (2) names and addresses of all officers, owners, partners, and members of the business; (3) the store's actual or estimated annual sales; (4) information related to the types of products sold by the store; and (5) information regarding the business's integrity and reputation, including whether any officers, owners, partners, or members of the business previously were denied, withdrawn, suspended, or fined because of SNAP violations. As part of the authorization process, the FNS may require a visit to a retail store to determine its eligibility, and the FNS also may require the applicant to provide additional information or documents relating to the nature and scope of the business and the business's integrity and reputation. See 7 C.F.R., Section 278.1. Once the FNS authorizes a retailer to redeem SNAP benefits, the retailer may conduct SNAP transactions using the FNS number it was assigned during the application process.

## II.     LINK Card Transactions

4. A SNAP benefits recipient can use the SNAP benefits on his/her Link card to make eligible food purchases by swiping his/her Link card through a point-of-sale device and entering

his/her personal identification number ("PIN"), similar to the process used in traditional debit card transactions. A retailer may obtain a point-of-sale device capable of accepting Link cards through the State's contractor for SNAP or through a third-party processor.

5. In parts of Illinois, and for East Side Market specifically, USDA reimbursement for SNAP benefits is administered by Conduent State and Local Solutions, Inc. ("Conduent"), through a contract with the IDHS. An Illinois retailer authorized to redeem SNAP benefits may contract directly with Conduent to process its SNAP transactions or it may contract with a third-party processor. In either scenario, the completion of a SNAP transaction requires wire communications and electronic funds transfers to be made in interstate commerce.

**III. Applicable Laws**

6. SNAP recipients may use their SNAP benefits only to purchase eligible food for the household, 7 C.F.R., Section 274.7(a), and they may use their SNAP benefits only at retailers that have been approved to participate in SNAP, 7 U.S.C., Section 2016(b).

7. Retailers may accept SNAP benefits only in exchange for eligible food; they are not allowed to accept SNAP benefits in exchange for cash. 7 C.F.R., Section 278.2(a). Retailers also are not allowed to accept SNAP benefits in payment of interest on loans and for any other nonfood use. *Id.* Buying, selling, or otherwise exchanging SNAP benefits for cash or consideration other than eligible food is commonly referred to as "trafficking" SNAP benefits. *See* 7 C.F.R., Section 271.2.

8. Federal law prohibits SNAP benefits "trafficking." 7 U.S.C., Section 2024(b). Specifically, Title 7, United States Code, Section 2024(b)(1) prohibits the knowing use, transfer, acquisition, alteration, or possession of SNAP benefits in any manner contrary to Title 7, United

States Code, Chapter 51 or the regulations issued pursuant to that chapter. A violation of Section 2024(b)(1) involving SNAP benefits of $100 or more is a felony. *Id.*

9. Federal law also prohibits individuals from presenting, or causing to be presented, SNAP benefits for payment or redemption, knowing those benefits to have been received, transferred, or used in any manner in violation of Title 7, United States Code, Chapter 51 or the regulations issued pursuant to that chapter. 7 U.S.C., Section 2024(c). A violation of Section 2024(c) involving SNAP benefits of $100 or more is a felony. *Id.*

10. Under 7 U.S.C., Section 2024(f), "[a]ll property, real and personal, used in a transaction or attempted transaction, to commit, or to facilitate the commission of, a violation (other than a misdemeanor) of subsection (b) or (c), or proceeds traceable to a violation of subsection (b) or (c), shall be subject to forfeiture to the United States . . . ." 7 U.S.C., Section 2024(f)(1)-(2). Under Section 2024(f)(3), however, "[n]o interest in property shall be forfeited under this subsection as the result of any act or omission established by the owner of the interest to have been committed or omitted without the knowledge or consent of the owner."

11. Title 18, United States Code, Section 371 prohibits persons from conspiring to commit an offense against the United States or defraud the United States or a U.S. agency, where one or more members of the conspiracy commit an act in furtherance of the conspiracy. 18 U.S.C., Section 371.

12. Persons who scheme to defraud the government through the trafficking of SNAP benefits, and cause interstate wires to be used in furtherance of the scheme, also may commit wire fraud, in violation of Title 18, United States Code, Section 1343. Persons who engage in a conspiracy to commit wire fraud also violate Title 18, United States Code, Section 1349. Proceeds

of wire fraud schemes are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C). Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [certain listed provisions of Title 18] or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18]), or a conspiracy to commit such offense." 18 U.S.C., Section 981(a)(1)(C). Wire fraud is an offense constituting "specified unlawful activity" as defined in Section 1956(c)(7). *See* 18 U.S.C., Sections 1956(c)(7)(A) and 1961(1).

**IV.     Overview of the Investigation**

13.    The investigation so far establishes probable cause to show that substantial SNAP benefit fraud is occurring at East Side Meat Market.

14.    FNS has an electronic system that allows agents to review all SNAP transactions made by authorized stores and SNAP transactions made by individual cardholders. This data shows the dates, times, locations, amounts, and EBT card balances of each SNAP transaction. USDA-OIG Special Agent Kory Kuba reviewed the SNAP redemptions for East Side Meat Market. For the period of August 2017 to June 2021, East Side Meat Market redeemed a total of approximately $1.49 million in SNAP benefits.

15.    One way to estimate SNAP fraud is to compare East Side Meat Market to the "store type state average" and the "store type county average." *See United States v. Jarjis*, No. 13-1430, 551 Fed. App'x 261 (6th Cir. 2014). FNS categorized East Side Meat Market as a medium-sized grocery store. The chart below illustrates these comparisons with various areas for the period of July 2017 to June 2021:

| Store | Amount | Difference |
|---|---|---|
| **East Side Meat Market** | $1,490,054 | |

| | | |
|---|---|---|
| St. Clair County Average | $316,396 | $1,173,658 |
| St. Louis County Average | $322,454 | $1,167,600 |
| State of Illinois Average | $461,845 | $1,028,209 |

This data shows East Side Meat Market redeemed substantially more in SNAP benefits than other medium-sized grocery stores in the area. This substantial difference suggests that East Side Meat Market is trafficking SNAP benefits on a large scale.

16.  A series of transactions with undercover EBT cards loaded with SNAP funds at East Side Meat Market confirmed that SNAP fraud is occurring there on a large scale.[1]

| Date | Amount | Received | Employees involved | Redeemed at |
|---|---|---|---|---|
| Nov. 2020 | $4.00 | Hot food | Staniece Luster | East Side Meat Market |
| Dec. 2020 | $4.70 | Hot food | Shandris Holmon | East Side Meat Market |
| Dec. 2020 | $841.04 | $420 in cash | Almahde Nijmeh | Sam's Club, Walmart, East Side Meat Market, Save a Lot |
| Jan. 2021 | $641.00 | $220 in cash | Almahde Nijmeh | Sam's Club, Save A Lot |
| Feb. 2021 | $55.52 | Cigarettes; cigarillos; cognac | Luie Nijmeh | East Side Meat Market |
| Mar. 2021 | $57.88 | Cigarettes; cognac | "Chris" | East Side Meat Market |
| Apr. 2021 | $80.98 | Cigarettes; cigarillos; cognac | Luie Nijmeh | East Side Meat Market |
| May 2021 | $44.00 | Cigarettes | Almahde Nijmeh | East Side Meat Market |
| May 2021 | $641.00 | $220 in cash | Almahde Nijmeh | East Side Meat Market; Walmart; Aldi; Sam's Club |
| July 2021 | $167.11 | Cigarettes; cigarillos; cognac | "Chris" | East Side Meat Market |
| July 2021 | $245.28 | $120.00 in cash | Almahde Nijmeh | East Side Meat Market |

---

[1] The government paid a confidential source for this work.

17. Based on my experience and consultations with other special agents, it is common for retail store owners to request to keep the EBT cards when exchanging cash for SNAP benefits. The EBT cards are then sometimes utilized to make purchases at other retail and/or wholesale locations, rather than redeeming them all on the East Side Meat Market SNAP account, in order to conceal the fraud. As the above table shows, this happened several times over the course of these undercover transactions. At times, SNAP benefits illegally purchased at East Side Meat Market were also redeemed at East Side Meat Market. At other times, SNAP benefits illegally purchased at East Side Meat Market were redeemed at other retail locations like Walmart, Sam's Club, Aldi, and Save A Lot. The items purchased at other locations were then likely resold at East Side Meat Market.

18. The May 2021 undercover EBT card with a balance of approximately $641.00 shows how this worked in practice. First, a substantial "food purchase" was made at East Side Meat Market with the undercover EBT card. No authorized cardholder was present for this transaction and no food was received. Thus, this transaction was likely made to redeem SNAP benefits from the undercover EBT card and was made in an odd dollar amount to disguise the illegal transaction.

19. On that same day, Almahde Nijmeh and Deleone Murphy AKA "Bud" departed East Side Meat Market in Almahde Nijmeh's 2017 Dodge Ram pickup truck (2017 Dodge Ram). The surveillance team followed the 2017 Dodge Ram to Walmart in O'Fallon, Illinois. Almahde Nijmeh and Bud both entered Walmart and filled up two carts with grocery items. Almahde Nijmeh exited Walmart empty handed and waited in the truck while the purchase was made by Bud. The undercover EBT card was used for a food purchase at Walmart in the amount of approximately $420.87. Surveillance video from Walmart shows a note taped to the undercover

EBT card.  This note likely has the PIN for the EBT card.  The groceries were loaded into the 2017 Dodge Ram.

20. Almahde Nijmeh and Bud then arrived at Aldi in O'Fallon, Illinois in the 2017 Dodge Ram.  Almahde Nijmeh and Bud both entered Aldi.  About 15 minutes later, Almahde Nijmeh exited Aldi without a cart or any groceries.  Bud purchased groceries in the total amount of approximately $688.63 using two different EBT cards; approximately $400.00 on EBT card ending 3697 in the name of S.F. and approximately $288.63 on EBT card ending 0243 in the name of G.B.  Bud exited Aldi with two carts filled with groceries.  The groceries were loaded into the 2017 Dodge Ram.

21. Almahde Nijmeh and Bud then arrived at Sam's Club in O'Fallon, Illinois.  Bud entered Sam's Club while Almahde Nijmeh waited in the truck in the parking lot.  Bud purchased groceries in the amount of approximately $147.86 using EBT card ending 5900 in the name of L.A. and the Sam's Club membership card in the name of E.S.  Bud exited Sam's Club from the loading area door with items in a cart.  Almahde Nijmeh drove the truck into the loading area and parked.  Bud then loaded items into the 2017 Dodge Ram.  After all the items were loaded, Bud reentered Sam's Club and Almahde Nijmeh parked the truck back in the parking lot.

22. Bud purchased more groceries in the amount of approximately $200 using EBT card ending 5261 in the name of C.B. and approximately $34.92 using EBT card ending 5900 in the name of L.A.  Bud used the same Sam's Club membership card in the name of E.S.  Bud exited Sam's Club from the loading area door with additional items.  The items were again loaded into the 2017 Dodge Ram.  At this time, the truck appeared to be full of items in the passenger compartment and in the bed.

23. Almahde Nijmeh and Bud then arrived at East Side Meat Market and backed the truck up to the side loading door of East Side Meat Market. Bud and a Middle-Eastern male unloaded the items from the truck and into East Side Meat Market.

24. On another occasion, Luie Nijmeh was seen retrieving an undercover EBT card from behind the counter. The undercover EBT card appeared to be in a container or bag, possibly with other EBT cards. The undercover EBT card had a sticky note attached to it with the PIN written on the sticky note. This supports probable cause to believe that Almahde Nijmeh regularly exchanges cash for EBT benefits and identifies the EBT cards by the PIN when there are multiple EBT cards stored together at East Side Meat Market.

25. The Sam's Club membership account belonging to E.S. was used for the purchases described above. Additional fraudulent purchases at Sam's Club were identified using S.L's membership account. Agent Kuba obtained all the EBT purchases made at Sam's Club using these membership accounts.

26. Those records show S.L.'s membership was issued in March 2020. From March 2020 to May 2021, at least 57 different SNAP EBT cards were used to make purchases with SNAP benefits at Sam's Club in O'Fallon, Illinois with one purchase in Saint Louis, Missouri for a total of approximately $24,803. Because S.L. worked at East Side Meat Market and because her Sam's Club membership was used to make purchases using the undercover SNAP EBT cards; this high number of SNAP accounts used on her Sam's Club membership establishes probable cause that her membership account has been used to purchase items with the SNAP EBT cards of numerous individuals; items that were likely resold at East Side Meat Market.

27. E.S.'s membership was issued in May 1999. From June 2019 to June 2021, at least 20 different EBT cards were used to make purchases with SNAP benefits at Sam's Club in

O'Fallon, Illinois for a total of approximately $7,894. Based on this analysis, and the prior use of E.S.'s membership in connection with the undercover SNAP EBT cards, there is probable cause to show Almahde Nijmeh used E.S.'s membership account to purchase items with numerous EBT cards and then likely resold the items at East Side Meat Market.

**V.     East Side Meat Market Business Records**

28.     On or about May 9, 2017, Articles of Organization for East Side Meat Market were filed with the Illinois Secretary of State. The registered agent's name was Jiehad Nijmeh and the registered office address was East Side Meat Market.

29.     On or about July 1, 2017, a Certification of Registration for Illinois Business Authorization was issued for East Side Meat Market with an expiration date of July 1, 2022. On or about this same date, a commercial lease agreement was made between Nedal Nijmeh (the lessor) and Jiehad Nijmeh d/b/a East Side Meat Market (the lessee). The agreement was for rent of East Side Meat Market for a term of two (2) years commencing on July 1, 2017 and terminating on June 30, 2019, or sooner, in the total amount of $48,000, payable in the amount of $2,000 per month. Jiehad Nijmeh and Nedal Nijmeh are brothers, and sons of Almahde Nijmeh.

30.     East Side Meat Market maintains a business account at Associated Bank (Account 7356). The Associated Bank Account 7356 received approximately $1,490,054 in SNAP redemptions, which greatly exceeded those of comparable stores and averages during the same period by at least $1,028,209, making this number a reasonable estimate of the fraud occurring at the store. *See Jarjis*, 551 Fed. App'x 261.

31.     Nedal Nijmeh wrote checks to himself from the East Side Meat Market Account in the total amount of approximately $207,735, all without signature authority on the account. Checks from Associated Bank Account 7356 were written to Nedal Nijmeh in the total

approximate amounts of $54,388 for the year 2018; $64,158 for the year 2019; $81,489 for the year 2020; and $7,700 for the year 2021 (through March 9, 2021).  The amounts of the checks do not match the East Side Meat Market lease agreement of $24,000 per year.  All of these checks, approximately 104 checks in total, were deposited into Commerce Bank Account 2690, which is Nedal Nijmeh's personal bank account.

32. During the period of January 2018 to April 2021, Commerce Bank Account 2690 was primarily funded by two sources: income from Nedal Nijmeh's employment at TWM (approximately 39% or $175,717) and checks from Associated Bank Account 7356 (approximately 46% or $207,735).

33. Even the most conservative estimate of fraud at East Side Meat Market far exceeds the $207,735 taken from the account by Nedal Nijmeh and placed into Commerce Bank Account 2690.  It appears that Nedal Nijmeh is depositing the proceeds of unlawful activity (fraudulent SNAP redemptions) conducted by Almahde Nijmeh and others at East Side Meat Market into Commerce Bank Account 2690, which is then used to fund Almahde Nijmeh's activities.

34. As the result of the investigation, the following items were seized from Nedal Nijmeh:

    a. $36,504.72 in funds seized from Commerce Bank Account 2690; and

    b. $7,600.00 in United States Currency seized from the residence of Nedal Nijmeh.

35. Based on the foregoing, declarant believes that the items described in paragraph 34 a and b, represent funds constituting or derived from proceeds of violations of Title 7, United States Code, Sections 2024(b) and (c) (Food Stamp Fraud); Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Section 1343 (Wire Fraud); and Title 18, United

States Code, Section 1956 (Money Laundering) and said funds are subject to forfeiture pursuant to 18 U.S.C., Section 981(a)(1)(C).

36. Pursuant to 28 U.S.C., Section 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of January, 2022.

_____
Marijo T. Gronewold
Special Agent
United States Department of Homeland
Security, Homeland Security Investigations